J-S14032-24

2024 PA Super 123

| | | |
|---|---|---|
| WILLIAM R. VIALL | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HARRY GARVIN AND HARRY FITHIAN | : | No. 869 MDA 2023 |

Appeal from the Judgment Entered September 19, 2023
In the Court of Common Pleas of Bradford County Civil Division at No(s):
2013 EJ 0057

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

OPINION BY MURRAY, J.:                    **FILED: JUNE 10, 2024**

William R. Viall (Appellant) appeals from the judgment entered against him and in favor of his adjoining landowners, Harry Garvin (Garvin) and Harry Fithian (Fithian) (collectively, Defendants), following a bench trial in this ejectment action.  After careful consideration, we affirm.

The relevant facts, as found by the trial court, are as follows:

> [Appellant] acquired title to … land which now consists of 2 parcels, Parcel Nos. 28-132.00-026 [(Parcel 026)] (approximately 43 acres) and 28-133.01-001 [(Parcel 001) (collectively, Appellant's Parcels)] (approximately 2 acres) located in Overton Township, Bradford County, Pennsylvania[,] by Deed dated June 12, 1972, and recorded in the Recorder of Deeds Office of Bradford County on December 18, 1972.  [Appellant's] brother, Burton Viall [(Burton)], acquired title to 2 parcels of land, parcel Nos. 28-132.00-025 [(Parcel 025A)] (approximately 32½ acres) and 28-132.00-025-002 [(Parcel 025B) (collectively, Burton's Parcels)] (approximately 8½ acres) on June 12, 1972, and January 25, 1975, respectively.  [Burton's Parcels] ... adjoins the Northwest portion of [Appellant's Parcels,] sharing the northwest boundary.

[Appellant's Parcels] and [Burton's Parcels] were deeded from their father, mother[,] [] aunt[,] and uncle and were part of the same tract of land owned by their father and others. **Their father had the property subdivided by survey prepared by R.A. Mengel [(the Mengel Survey)] dated April 30, 1972. (See Exhibit P-2). The [Mengel S]urvey was not recorded but was referred to in the subject deeds.** Both parcels consist of fields and wooded areas.

Defendants purchased [Burton's Parcels] in 2004. **Since purchasing, Defendants began using the property and erected a road and cabin <u>in an area which is east of a [stone wall,</u>] which [Appellant] claims is his property.** This brought about the instant litigation.

Trial Court Opinion, 5/18/23, at 1-2 (emphasis added; format modified).

As the trial court explained,

[p]rior to the sale [of Burton's Parcels], [Defendants'] real estate agent hired surveyor[] Joshua Gavitt [(Gavitt)] to mark corners of the property. The corners that Gavitt marked on the northeast and southeast portion of [Burton's Parcels] bordering Appellant's [Parcels] included the disputed area to the east of the stone wall.

Defendants began using the disputed area to the east of the stone wall. They placed a travel camper upon this disputed area. [Appellant] discovered the trailer sometime in 2005. [Appellant] confronted Defendants in August 2005 and advised them that the boundary was the stone wall. Although [D]efendants removed the travel trailer, they continued to use the property to the east of the stone wall. Defendants obtained a retracement survey prepared by Gavitt which was completed in June 2006 [(the Gavitt Survey)]. **Pursuant to the [Gavitt S]urvey, the boundary line is approximately one hundred twenty-five (125) feet to the east of the stone wall.** Defendants then plowed out the stone and cleared a portion of the disputed area. They then built a cabin and road in the disputed area[,] which were completed on or about September 2006.

*Id.* at 4 (emphasis added; paragraph designations omitted; punctuation modified).

Upon discovering Defendants' cabin in 2006 or 2007, Appellant hired Eric Hopkins (Hopkins) to survey Appellant's Parcels. *Id.* at 5. Appellant paid Hopkins approximately $800.00. *Id.* Hopkins's survey (the Hopkins Survey) confirmed the Gavitt Survey, *i.e.*, Burton's Parcels include the disputed property east of the stone wall.[1] *Id.*

In 2011, Appellant sent a letter to Defendants claiming the stone wall as the boundary line between the two parcels. *Id.* Defendants disagreed, advising Appellant to contact Defendants' surveyor. *Id.* In 2013, Appellant commenced the instant ejectment action against Defendants.

Appellant subsequently asked Hopkins to revise the Hopkins Survey. As found by the trial court, Appellant

> offered Hopkins Ten Thousand ($10,000.00) Dollars and to "slow walk the lawsuit"[,] thereby running the statute of limitations for a lawsuit against Gavitt[,] to reconsider and change [the Hopkins Survey] so that the boundary line would be along the stone wall as [Appellant] wished it to be. ([Appellant] believed that Hopkins was friends with Gavitt and[,] as a result[, Appellant believed] Hopkins didn't want to change his survey for fear his friend would have filed a lawsuit [] against him). Hopkins refused to change his survey.

*Id.* at 5.

Appellant next obtained a survey from Hunt Engineers (the Hunt Survey). Again, the January 6, 2016, Hunt Survey placed the boundary line in the same location as the boundary found by the Gavitt Survey.

---

[1] Appellant filed a complaint against Hopkins with the Professional Board of Surveyors, which subsequently was dismissed.

In 2022, nine years after initiating the instant litigation, Appellant hired Brent Birth (Birth) to survey Appellant's Parcels. This survey (the Birth Survey) placed the boundary line at the stone wall.

In February 2023, Appellant's ejectment action against Defendants proceeded to a non-jury trial. The trial court ultimately entered a verdict in favor of Defendants and against Appellant, finding Appellant failed to establish a consentable boundary line at the stone wall. Trial Court Opinion, 5/18/23, at 12-13. The trial court found that the boundary of Burton's Parcels lies to the east of the stone wall. *Id.* at 13. Appellant filed post-trial motions, which the trial court denied.[2] Upon entry of judgment, Appellant timely filed the instant appeal. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issues:

A.   Whether the trial court abused its discretion when determining that Appellant failed to sustain his burden of proof regarding consentable lines.

   1. [The trial court] misapplied the applicable law to consentable lines.

   2. [The trial court's] exclusion of crucial information exceeded the scope of its authority.

      a.   The state of mind exception to the general rules of hearsay is applicable under the circumstances.

---

[2] Judgment was entered following remand by this Court for the determination of Appellant's post-trial motions. *See Viall v. Garvin*, No. 869 MDA 2023 (Pa. Super. filed Sept. 4, 2023) (order).

    i.  [Burton's] statements about the stone wall
        were clearly admissible pursuant to this
        exception.

    ii. Richard Viall's [(Richard)] statements to
        Appellant about the boundary line were equally
        admissible under this rule.

    iii. Guy Parish [(Parish)] should have been
         permitted to testify regarding the genesis of
         his understanding that the stone wall marked
         Appellant's and [Burton's] property line.

    iv. [The trial court] should have allowed Victor
        Viall [(Victor)] to testify about the statements
        contained within his affidavit and then
        accepted the document into evidence.

    b.    The foregoing statements and others made in the
    community were admissible under Pa.R.E. 803(20):
    Reputation Concerning Boundaries or General History.

B.    Alternatively, whether competent evidence existed to
permit [the trial court to find that Defendants] established a
boundary to the east of the wall, thus permitting [Defendants] to
have built a cabin in the disputed area and knock down a portion
of the southern stone wall to install a driveway.[FN]

---

[FN] **Each subsection does not represent separate questions
presented.** Rather, each goes toward the totality of evidence
being incompetent to justify [the trial court's] conclusion and have
been included this way to avoid mashing together many different
areas of the record.

Appellant's Brief at 5-6 (issues renumbered; emphasis added; capitalization

and punctuation modified; footnote in original).

    We initially recognize our scope and standard of review:

    Our standard of review in equity matters is limited to determining
    whether the trial court committed an error of law or an abuse of
    discretion.   The scope of review of a final decree in equity is

- 5 -

limited and will not be disturbed unless it is unsupported by the evidence or demonstrably capricious.

***Coldren v. Peterman***, 763 A.2d 905, 907-08 (Pa. Super. 2000).

In addition, in an appeal stemming from a non-jury trial, an appellate court is bound by the trial court's findings of fact unless those findings are not based on competent evidence. ***L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.***, 777 A.2d 1090, 1092 (Pa. Super. 2001).

> It is not the role of an appellate court to pass on the credibility of witnesses or to act as the trier of fact. In a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations. Nonetheless, the trial court's conclusions of law are not binding on an appellate court. This is so because it is the appellate court's duty to determine whether the trial court correctly applied the law to the facts.

***Id.*** at 1092-93.

Appellant filed this action in ejectment. "Ejectment is an action filed by a plaintiff who does not possess the land but has a right to possess it, against a defendant who has actual possession." ***Becker v. Wishard***, 202 A.3d 718, 721 (Pa. Super. 2019) (quoting ***Siskos v. Britz***, 790 A.2d 1000, 1006 (Pa. 2002)).

> An ejectment action differs from a quiet title action in that quiet title serves to determine the relative and respective rights of all potential title holders. In contrast, ejectment determines the immediate rights as between the plaintiff and the defendant.
>
> Therefore, to prevail in an ejectment action, the plaintiff must show title at the commencement of the action and can recover, if at all, only on the strength of his own title, not because of weakness or deficiency of title in the defendant….

*Id.* at 721-22 (citations, footnote, and quotation marks omitted). "Until and unless the plaintiff has made a *prima facie* case by showing title sufficient upon which to base a right of recovery, the defendant is not required to offer evidence of his title." **Hallman v. Turns**, 482 A.2d 1284, 1287 (Pa. Super. 1984).

**Whether the Trial Court Erred in Finding No Consentable Line**

Appellant first argues he established a boundary line at the stone wall under the consentable lines doctrine. Under that doctrine, a boundary between neighboring properties may be established either by (1) "dispute and compromise between the parties," or (2) "recognition and acquiescence by one party of the right and title of the other." **Moore v. Moore**, 921 A.2d 1, 4 (Pa. Super. 2007). Appellant's issues assert a consentable line by recognition and acquiescence.

Appellant first argues the trial court abused its discretion when it rejected his claim of a consentable boundary line at the stone wall. Appellant's Brief at 16. Appellant directs our attention to evidence that he engaged in activities demonstrating his belief that the stone wall formed the boundary between Appellant's Parcels and Burton's Parcels. *Id.* at 20-21. Appellant points out that, upon being deeded Appellant's Parcels in 1972, he "cleared seventeen acres from the [w]all eastward[.]" *Id.* at 16. Appellant asserts he undertook the following activities, in 1972, demonstrating his belief that the stone wall formed the boundary line between the parcels:

1. Appellant and [his father, Richard] erected a rudimentary cabin and fence mostly along the bottom portion of his property. *Id.* at 20.

2. Appellant carved his initials and two blaze marks on a tree near the "structure's end to further commemorate" the property line. *Id.*

3. Appellant put up "two strands of [] barbwire fence … from the stone wall up to the northwest corner of the property." *Id.*

4. Appellant harvested and sold wood from ash trees located within the disputed area. *Id.*

5. Upon clearing the trees, Appellant planted corn and farmed the area. *Id.*

6. Appellant kept livestock and hay inside the structure. *Id.*

7. Appellant harvested apples and blueberries from the disputed area. *Id.*

Appellant testified he continued these activities in 1973, and "actually lived there." *Id.* at 21.

Appellant claims he granted neighbors permission to traverse the field in the disputed area, to access Litzelman Pond. *Id.* Appellant points to his testimony that in 1974, although he became a "long distance landowner," he viewed the property to the east of the wall as his own. *Id.* Appellant states he "recruited Bob Epler to timber the disputed area," while Burton did the same on the western side of the wall. *Id.* Appellant asserts he was the

point of contact for those wishing to hunt, fish or use the field road; and returned to the property upwards of five times annually, which lasted more than three decades.

- 8 -

*Id.* Appellant acknowledges the trial court credited his testimony as to these activities, as they are adopted in the trial court's findings of fact. *Id.*

Appellant compares the facts in this case to those found to establish a consentable line in *Risinger v. Litzinger*, 225 A.3d 1199 (Pa. Super. 2019) (unpublished memorandum). Appellant claims the Court in *Risinger* found a consentable line based on the property owners' "united attitude" that a barbed wire fence served as a border between the properties. Appellant's Brief at 22-23. Appellant also compares the stone wall in this case to the hedgerow this Court deemed a consentable line in *Plauchak v. Boling*, 653 A.2d 671 (Pa. Super. 1995). Appellant argues, his "labors succinctly match prior hallmarks that constituted enough to formulate consentable lines." Appellant's Brief at 23. Appellant asserts, "[h]is determinate sweat cast a cloud over the disputed area, never to be contested by his brother." *Id.* at 24.

Appellant argues the trial court failed to consider the character of the Viall Property and its "uniqueness":

> [The trial court] did not regard the premises' character as being of great importance. The two parcels were family owned, passed down generationally; and, for the most part, held remotely, unlike traditional legal contests where two neighbors reside next to one another for a prolonged time, and each attributes continuous and ongoing ventures to his side of the fence….

*Id.* at 24. Appellant repeatedly claims an understanding with his brother that the wall constituted the boundary line between the parcels. *See id.* at 25-26.

Appellant also points out that a neighbor, Glen Gaul (Gaul), stated that he frequently visited the property and indicated that the surrounding

community generally considered a stone wall as the dissection between farms.

*Id.* at 26.

> This Court has explained,
>
> > [t]he establishment of a boundary line by acquiescence for the statutory period of twenty-one years has long been recognized in Pennsylvania to quiet title and discourage vexatious litigation. Based upon a rule of repose sometimes known as the doctrine of consentable line, the existence of such a boundary may be proved either by dispute and compromise between the parties or recognition and acquiescence by one party of the right and title of the other….

*Moore*, 921 A.2d at 4-5 (citations and internal quotation marks omitted).

> [I]f adjoining landowners occupy their respective premises up to a certain line which **they mutually recognize and acquiesce** in for the period of time prescribed by the statute of limitations, they are precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one.

*Plauchak*, 653 A.2d at 675 (emphasis added) (quoting *Plott v. Cole*, 547 A.2d 1216, 1221 (Pa. Super. 1988)). Thus, recognition and acquiescence is proven where "each party has claimed the land on his side of the line as his own" and has "occupied the land on his side of the line for a continuous period of 21 years." *Moore*, 921 A.2d at 5.

> Acquiescence,
>
> > in the context of a dispute over real property, denotes passive conduct on the part of the lawful owner consisting of failure on his part to assert his paramount rights or interests against the hostile claims of the adverse user.

*Id.* (internal quotation marks and citation omitted). For example, where neighbors maintain their respective yards up to the point of a certain marker

- 10 -

or monument, such as a fence or hedgerow, a consentable line may be established. *See Plauchak*, 653 A.2d at 676-77 (recognizing a hedgerow as the boundary line). A consentable line may be established where the parties have simply historically mistaken the actual location of the line between their properties. *Zeglin v. Gahagen*, 812 A.2d 558, 562 (Pa. 2002).

At trial, Appellant and Defendants stipulated that Appellant's Parcels and Burton's Parcels "were both part of a much larger parcel, the Viall Family lands, that had been jointly owned[.]" N.T., 1/21/23, at 6. They further stipulated that the original parcel had been subdivided, in accordance with the Mengel Survey. *Id.* The parties stipulated that Burton conveyed Burton's Parcels to Defendants on December 20, 2004. *Id.*

Appellant presented the testimony of Birth, Appellant's expert surveyor. N.T., 1/21/23, at 24. Birth testified Appellant hired him to "do a boundary retracement survey of his property that he acquired [from] his parents and aunt and uncle." *Id.* at 28. According to Birth, the retracement surveyor

> follow[s] the footsteps of a parcel created [*sic*], the surveyor created that out of a larger parcel and use[s] that to try and determine the boundaries that … he shows in his sub-division or whatever footsteps he took in essence.

*Id.* at 30-31.

Birth acknowledged that Appellant's Parcels and Burton's Parcels were created by a 1972 subdivision, originally surveyed by R.A. Mengel (Mengel). *Id.* at 31. He acknowledged that subdivision surveys are not always recorded. *Id.* Birth explained he reviewed the two deeds from Bernard and Ida Malloy

- 11 -

(Appellant's aunt and uncle) and Richard and Marion Viall (Appellant's mother and father), to Appellant and Burton, respectively. *Id.* at 36. The deeds to Appellant and Burton were dated June 12, 1972, and both referred to the 1972 Mengel Survey. *Id.*

Birth opined that his retracement survey is consistent with the Mengel Survey. *Id.* at 37. Birth indicated he found a ¾ inch iron pipe, and an iron pin in the remnants of a stone wall, marking the southeast corner of Appellant's Parcels at the stone wall. *Id.* at 39-40. Birth also found a pipe marking the northwest corner of Appellant's Parcels. *Id.* at 47. This pipe was consistent with a pipe noted in the Mengel Survey. *Id.* According to Birth, a monument found on a survey of the neighboring property showed a boundary consistent with placing the southeast boundary of Appellant's Parcels at the iron pipe/stone wall. *Id.* at 52.

Birth opined that Defendants' cabin, constructed to the east of the stone wall's remnants, is east of the boundary depicted on the Mengel Survey, and therefore constructed on Appellant's Parcels. *Id.* at 64.

Appellant testified that from about 1945 through 1972, there was an old schoolhouse on the undivided property owned by his father. *Id.* at 139. When the schoolhouse fell in 1972, Appellant and his father built a "rudimentary cabin" on the property. *Id.* at 139-40. Regarding his use of the disputed property east of the stone wall, Appellant testified as follows:

> [T]here was a … beautiful stand of ash trees that I harvested, split
> into fence posts and sharpened and took them to the … stock yard

for sale to pay for my truck. Once the field was cleared, … I cultivated it, we planted corn in the field[;] we farmed the property[;] I farmed the property. There was a barn on the property so we kept … livestock in the barn and we kept hay in the barn and the[] … huckleberries were great and the apple orchard, we harvested apples.

*Id.* at 141.

Appellant testified the property was subdivided in 1972, when he was 15 years old. *Id.* at 145. Appellant explained that in 1972, a stone wall

[e]xtended from the back of my barn along the southern border of my property to a corner and then it extended approximately eleven hundred feet north and east along the property line.

*Id.* at 152. Appellant stated this stone wall on the west connected with a stone wall on the southern border of his property. *Id.* at 153.

Appellant testified he installed an electric fence along the bottom portion of the property line, "near the orchard for the pigs, and then we put up about two strands of … barb-wire fence up … from the stone wall up to the northwest corner of the property." *Id.* at 154-55. In 1972, Appellant stated, he marked a tree with two blaze marks and his initials to denote the northwest corner of his property. *Id.* at 156-57. Appellant stated his father put a cast-iron pot in a tree to mark the southwest corner of the property. *Id.* at 158-59. Appellant confirmed that from 1972 onwards, he considered the stone wall to be the western boundary of Appellant's Parcels. *Id.* at 160.

Appellant testified to his activities on the property to the west of the stone wall from 1972-74. *Id.* at 161-64. **From 1974 onwards, Appellant visited the property three or four times a year.** *Id.* at 167. Appellant

also granted people permission to go hunting and fishing on the property to the east of the stone wall (on Burton's Parcels). *Id.* at 167-68. After acquiring Appellant's Parcels, Appellant confirmed he allowed family members to use the property. *Id.* at 189.

Appellant explained that in 2005, he observed Defendants' camper in the field east of the stone wall. *Id.* at 161. At that time, Appellant offered Defendants $5,000 for the field to the east of the stone wall. *Id.* at 177. However, Defendants did not respond to the offer. *Id.*

Appellant next hired Hopkins to survey Appellant's Parcel. *Id.* Appellant paid Hopkins $800.00 for the survey. *Id.* However, Appellant testified, Hopkins "pretty much just rubber stamped the Gavitt Survey.[3] *Id.* Appellant repeatedly asked Hopkins to "re-do his survey the right way." *Id.* at 178. Appellant complained Hopkins "rendered his survey without walking the property with me or talking to me about the property or any of the locations of the pins or anything of that nature." *Id.* at 179. According to Appellant, when Appellant requested Hopkins redo the survey, Hopkins emailed him requesting more money. *Id.* at 180. Appellant responded, "would you consider Ten Thousand ($10,000.00) Dollars?" *Id.*

---

[3] Gavitt had surveyed the property for a real estate agency, Robin Realty, prior to Defendants' purchase of Burton's Parcels.

On cross-examination, Appellant admitted Hopkins agreed to meet with Appellant, but Hopkins refused to change the Hopkins Survey. *Id.* at 49-50. Appellant explained his email offer of $10,000.00 to Hopkins:

Q. [Defendants' Counsel:] … [A]nd in this e-mail, you'll agree that you didn't respond to [Hopkins] and say [] hold up a minute, I've got some information that's gonna blow this case wide open and if you do a thorough survey for me[,] I may consider paying you Ten Thousand Dollars, that's not what this says, right?

A. [Appellant:]  No, it's  not.

Q.  And then you said, after offering him Ten Thousand Dollars, I could slow walk the lawsuit for another two years, which would let Gavitt off the hook because it would be twelve years since his survey.  Why would you tell him this?

A.  Because I knew he and Gavitt were working together on the property, on the surveys.

….

Q.  … [S]o you're going to slow walk the lawsuit, what does that mean?

A.  Slow walk the lawsuit would mean that I wouldn't sue them[,] I guess.

Q.  No, you already sued them at this point.  You sued them in 2013, this is 2016.

….

Q.  … I just want you to tell the [c]ourt what you mean by slow walking the lawsuit?

A.   It means to not sue someone until after the … statute of limitations has run out.

*Id.* at 50-51.   Appellant explained that "Hopkins and I had a conversation about … surveyors being sued and he told me that Gavitt did not have

- 15 -

insurance." *Id.* at 51. Appellant confirmed that Hopkins rejected Appellant's $10,000.00 offer. *Id.* at 52.

Appellant next hired Hunt Engineers to survey Appellant's Parcel. *Id.* at 184. The Hunt Survey agreed with the boundaries set forth in the Gavitt Survey and the Hopkins Survey. *Id.* at 184-85. Appellant refused to pay for the Hunt Survey. *Id.* at 187.

During cross-examination, Appellant conceded that from 1971 to 1974, he did not recall Burton visiting Burton's Parcels. N.T. (Vol. I), 2/22/23, at 14. Appellant further confirmed that from 1981-84, he visited the property less than once or twice a year. *Id.* at 14-15. Throughout Burton's ownership of Burton's Parcel, **Appellant never saw Burton visit Burton's Parcels**. *Id.* at 16.

Appellant also presented the testimony of Victor, his brother. Victor explained that in 1971, his (and Appellant's) father, Richard, also deeded property to him. N.T. (Vol. II), 2/22/23, at 2. Victor testified to *his own* understanding that the stone wall constitutes the boundary between Appellant's Parcels and Burton's Parcel. *Id.* at 6. Victor stated that after Richard divided the property between Appellant and Burton, Victor did not have "any affiliation with it. It was just [Burton's] property and it stayed bare." *Id.* at 7.

Glen Gaul (Gaul), who owns a neighboring property,[4] testified that he believed the stone wall to be the boundary between Appellant's Parcels and Burton's Parcels. *Id.* at 15. Gaul offered the following testimony regarding the boundary line between Appellant's Parcels and Burton's Parcels:

Q. [Appellant's counsel:] … [D]id you have an understanding then as to … the location of the boundary line between the two (2) properties?

A. [Gaul:] … I've always understand [*sic*] from any of the properties I hunted up there that the stone walls were always the boundary lines and so I've also used that while I was hunting on a property. If I was hunting somewhere and I go to a stone wall [*sic*] I didn't cross it. …[T]he property on the other side would've been somebody else's.

*Id.* at 18. When asked whether he remembered "many people" saying that one side of the stone wall belonged to Appellant, Gaul stated,

I can't say many people. I just know that y[ou] know when we hunted up there … we watched our boundaries wherever we went. So I … remember that they said one side is [Appellant's] and the other side is the brothers [*sic*], I remember that.

*Id.* at 19. **On cross-examination, Gaul testified that no one expressly pointed out the boundary line between the properties.** *Id.* at 26.

Mitch Higley (Higley) testified that he logged Burton's Parcels "[a] lot of years ago." *Id.* at 33. According to Higley, he logged up to the stone wall. *Id.* at 37. **Higley could not testify with certainty whether he logged east or west of the wall.** *Id.* at 38.

---

[4] Gaul testified he shared ownership of his property with six other people. N.T. (Vol. II), 2/22/23, at 13.

Defendants contested Appellant's claim of a consentable boundary line. Defendants presented the testimony of Tina Richland (Richland), a licensed real estate broker. *Id.* at 49. Richland testified that in 2004, she worked for Robin Realty. *Id.* As a realtor for Robin Realty, Richland represented Defendants in the sale of Burton's Parcels to Defendants. *Id.* at 50. Richland testified that a stone wall was not mentioned as the boundary of Burton's Parcels. *Id.* at 54. However, Richland did not walk the property herself. *Id.* at 63. At the time of the sale, Richland testified, she did not believe the property lines of Burton's Parcels were marked. *Id.* at 64-65.

John Richland (Mr. Richland), Richland's husband, testified that in 2004, he, too, worked at Robin Realty as a real estate agent. *Id.* at 70-72. According to Mr. Richland, prior to the sale of Burton's Parcels, he walked with Defendants around the property. *Id.* at 73. Mr. Richland explained,

> I had shown [Burton's Parcels] at least two (2) times before I met with [Defendants] and I was still unfamiliar with that line that ran through the field[,] so I went down to the assessment office … and looked up the black and white maps to see if there was anything that would differentiate and show me that line and I just happened to see … this property line ran right through the middle of this pine tree. Now I know it's not one hundred (100%) accurate[,] but it got me very close to where I felt the line was.

*Id.* Mr. Richland stated the pine tree was clear on the map: "Just like this whole field with one pine tree. So it was very easy to tell." *Id.* at 74. Mr. Richland testified the pine tree is northeast of the stone wall. *Id.*

Defendants also presented the testimony of defendant Garvin. N.T., 2/23/23, at 1. Garvin testified that he owns Burton's Parcels with defendant

Fithian. *Id.* at 2. Garvin confirmed Defendants purchased Burton's Parcels in 2004. *Id.* According to Garvin, before purchasing the property, he walked the boundary lines of Burton's Parcels with Mr. Richland. *Id.* at 5. **Garvin saw no pots or iron markers marking boundary lines. *Id.*** at 5-6. Garvin had walked the property "dozens of times," but only recently observed a pot placed on the property. *Id.* at 6-7.

Garvin confirmed several locations noted on the Gavitt Survey, including soil test pits, light woods, and the pine tree marking the western boundary of Burton's Parcels. *Id.* at 7-8. Garvin never saw a tree marked with blazes. *Id.* at 9. When Garvin walked the property, there was light snow on the ground. *Id.* At that time, he did not observe a stone wall. *Id.* No one identified the stone wall as a boundary line prior to Garvin's purchase of Burton's Parcels. *Id.* at 12-13.

After purchasing Burton's Parcels, Garvin testified, he placed a camping trailer on the property. *Id.* at 13-14. Appellant advised Garvin that the trailer was on Appellant's Parcels. *Id.* at 14. Garvin moved the trailer the following day. *Id.* at 15. Garvin next placed the trailer east of the stone wall. *Id.* The trailer remained east of the stone wall for approximately two years. *Id.* at 16. **During that time, Appellant did not dispute the trailer's location. *Id.*** at 17.

When asked whether Garvin had contact with Appellant in 2006, he responded,

I never had issues with [Appellant] that I recall. … I was brush hogging around the cabin when it was first put in … and I seen [*sic*] Appellant up there and he said could you do mine, he had a little field there and I said sure, and I did it. That was the end of it.

*Id.* at 18.

Garvin recalled one meeting, between Appellant, Fithian and Garvin, prior to constructing his cabin on the property. *Id.* at 19. Defendants had constructed a road on Burton's Parcels, and Appellant, disputing its location, asked to meet. *Id.* at 23-24. At the meeting, Garvin testified, Appellant and Defendants discussed "the property line." *Id.* at 19. They walked to the southeast corner of Burton's Parcels, and "started walking back measuring the distance." *Id.* at 20. After measuring, they found Burton's Parcels' southeast corner was within feet of the location shown on the Gavitt Survey. *Id.* at 21. Appellant did not show Defendants a cast iron pot, marked tree or barbed wire purportedly marking the boundary. *Id.* at 22.

Defendants constructed their cabin to the east of the stone wall in 2007. *Id.* at 29. According to Garvin, Appellant complained about the cabin in 2011, and "told me it was on his property." *Id.* at 32. Garvin received a letter from Appellant dated January 13, 2011. *Id.* at 33. Garvin testified that on February 22, 2011, he sent a letter advising Appellant to discuss the boundary with Defendants' surveyor, Gavitt. *Id.* at 35.

Garvin identified a photo of the clay pot, which, Appellant claimed, marked the boundary of Burton's Parcel. *Id.* at 36-37. Garvin testified he

first observed this pot on Burton's Parcels two weeks prior to trial. *Id.* at 37. Garvin confirmed he walked past the location of the pot "dozens and dozens of times, never seen it." *Id.* Garvin also had never noticed the marked tree. *Id.* at 38.

Defendant Fithian testified at trial that he had not previously observed any pot on Burton's Parcels. *Id.* at 80. Fithian explained that before purchasing the property, Mr. Richland showed Burton's Parcels to Defendants. *Id.* at 82. While walking on the property, Fithian observed the pine tree denoted on the Gavitt Survey, which marked the boundary of Burton's Parcels. *Id.* at 82. Fithian never saw a marked tree on the property. *Id.* at 83. Regarding the stone wall, Fithian testified,

> I've never seen a wall, okay. … I've never seen any rocks there that I could not drive my truck over. When Mr. Rich[land] said yesterday in his testimony, he never saw a wall, neither. … [W]e finally went up later on and saw because there wasn't any snow on the ground, I saw there were some rocks. Not little rocks, I mean there's some big ones but, three and a half/four foot, I don't think there was anything higher than a foot and a half along there.

*Id.* at 84.

Hopkins testified for Defendants regarding his survey of Burton's Parcels. N.T. (Vol. 1), 3/6/23, at 1. Hopkins acknowledged his belief that Appellant's $10,000.00 offer, to change the Hopkins Survey, constituted a bribe. *Id.* at 5. According to Hopkins, he normally charged $85.00 per hour, for his two-man crew. *Id.* at 6-7.

Hopkins explained the differences in measurements between his survey and the Mengel Survey:

[T]here's a difference in surveying in 2009 than what there is in 1972, so it's not uncommon to come up with some different measurements. … [] Mengel could have been using the steel tape to do his measurements where we were measuring everything with a Total Station, all of our measurements were done by laser, everything was horizontally measured so you're going to come up with some small discrepancies. … I remember [Appellant's] deed called for … 1[,]099 feet for the width on the north end of his property and according to my survey, we have 1,103[,] so we actually came up with about four feet more than what his deed called for. And I remember the … distances from … south to … the north side … were a little bit different than what the Mengel [S]urvey was, but like I said, … you don't know what equipment he was using in 1972 to make his measurements and honestly it depends on the different surveyors, you know. … I've never ran into [] Mengel's work anywhere else before so … I can't guess testify [*sic*] to whether or not I thought … he did good accurate work or not[.]

*Id.* at 9-10. When asked whether his review of the Mengel Survey changed his mind about the boundary line location, Hopkins testified: "[W]hen [Appellant] gave me the copy of the … Mengel Survey, all that did was solidify in my mind that where we had the property lines established [was] correct." *Id.* at 21.

Defendants presented the expert testimony of Gavitt, a licensed land surveyor, as an expert in boundary retracement. *Id.* at 25, 42. Gavitt testified regarding his retracement survey of Burton's Parcels. *Id.* at 44. According to Gavitt, before surveying a property, he would research "the subject deed, adjoining deeds, tax map, things of that nature." *Id.* at 45. Gavitt obtained the tax map and the current deeds for Burton's Parcels and

the adjoining parcels. *Id.* During his research, Gavitt found nothing designating the stone wall as a property boundary. *Id.* at 49.

According to Gavitt,

I would have plotted that information graphically, using a computer, [] input the bearings and distances into the computer and it basically creates a shape of the property, … and I'll do that with the adjoining properties and put it together and then with that deed plot in hand, I would visit the site….

*Id.* at 46. While researching the deeds, Gavitt discovered references to the Mengel Survey. *Id.* However, he did not "come across the physical plan[.]" *Id.*

After plotting the information and creating a deed plot, Gavitt explained,

I would have visited the site with one or two other individuals helping me and we would have started to do, … using a metal detector, hand compass, two hundred foot cloth tape, we would begin what we call the reconnaissance phase of a survey[,] where we just go out and try and find existing corner monumentation or any signs of the property line and then once we find something[,] we just start measuring using the deeds, using the compass and tape measure just to try to find the other corners. … They asked me to find the existing corner markers at that time.

*Id.* at 47-48. Gavitt acknowledged that many corner markers were missing:

At the northwest corner of Burton's [Parcels,] …there was no physical corner marker there. At the southeast corner there was no physical corner marker there. In the southwest … there was no physical corner marker there either. I did find some to the northwest, that I was able to recover and flag.

*Id.* at 48.

In October 2005, Gavitt testified, Fithian asked Gavitt to formally survey the property. *Id.* at 50. According to Gavitt, Defendants requested a

boundary retracement survey. *Id.* He explained that in a boundary retracement survey,

> the lines are already existing, so maybe they're lost, maybe they were never marked. My job is to go out and put the deed of record on the ground and mark the lines for them on the ground, that's a boundary retracement survey.

*Id.* Prior to 2005, Gavitt did not know either Defendant. *Id.* at 51.

Gavitt testified that he performed courthouse research on the deed to Burton's Parcels and adjoining properties. *Id.* at 51. Gavitt testified that he researched not only Burton's Parcels, but also the "parent tract" from which it came, Viall Farm. *Id.* at 54. According to Gavitt, the parent tract consisted of two parcels totaling one hundred forty-two (142) acres. *Id.* at 55. He explained that

> once the courthouse research is complete, we'll plot the deeds of record and make those graphical shapes and then visit the site[,] perform our reconnaissance phase of the survey where we try to find the existing monumentation and then once that's completed, using a total station, which is an instrument that measures horizontal angle, vertical angle and distance.

*Id.* at 52. Gavitt testified that he visited Burton's Parcels "[f]our times to do the preliminary survey and then to do the final survey." *Id.* at 58.

Gavitt testified he found the original "southeast corner and an existing iron pipe at the southwest corner of the [Viall Farm] that … matches the deed descriptions." *Id.* at 61. Gavitt disputed Birth's description of an iron pipe as designating a boundary between the properties. *Id.* at 66-67. Gavitt testified

that measurements contained in the Mengel Survey confirmed his boundary line placement east of the stone wall. *Id.* at 84.

In assessing this evidence, the trial court concluded Appellant failed to establish a boundary line at the stone wall by means of a survey. Trial Court Opinion, 5/18/23, at 10. The trial court opined,

> [Appellant] had [two] surveyors find the boundary line between [his] and [Defendants' Parcels] located where Gavitt found it. … [T]he court finds Gavitt's testimony and retracement survey more credible than [Appellant's] expert. The boundary line set by the Mengel [S]urvey is the same boundary line set by Gavitt, Hopkins and Hunt Engineers.

*Id.* The trial court's findings are supported by the evidence of record.

In assessing whether the trial court properly determined Appellant failed to establish a consentable line at the stone wall, we observe the following. Appellant compares the facts in this case to those found to establish a consentable line in *Risinger* and *Plauchak*. In *Risinger*, an unpublished memorandum,[5] this Court affirmed the finding of a consentable line by recognition and acquiescence. *See Risinger*, 225 A.3d 1199 (unpublished memorandum at 1). In that case, since the 1950s, the "Hill" property and the "Cramer" property were separated by a barbed wire fence. *Id.* (unpublished memorandum at 2). The Hill and Cramer properties subsequently became

---

[5] *See* Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019 may be cited for their persuasive value).

owned by Shirley Risinger (Risinger) and the defendants, Mary Lois Litzinger (Litzinger), and Michael and Megan Apjok (the Apjoks) (collectively, the defendants). *Id.* In the 1970s, Litizinger constructed a wood fence "on or about the same line as the old[,] barbed wire fence line[.]" *Id.* When that fence fell into disrepair, a row of hemlocks was planted "a few feet away from the fence line to allow for the trees to grow without encroaching on Risinger's side of the line." *Id.*

Despite the Apjoks' survey showing their ownership of property beyond the hemlock row, this Court affirmed the trial court's finding of a consentable line within feet of the hemlock row:

> Defendants and their predecessors treated the land on the other side of the fence as belonging to Risinger, planted the hemlocks far enough away from the fence line so that they would not encroach upon Risinger's side of the line, and asked Risinger's permission to go onto her side of that fence line to trim the trees. Accordingly, the trial court committed no error in concluding that the boundary by consent is located five feet west of the center of the hemlock tree line, which is where Litzinger's fence was in the 1970s.

*Id.* (unpublished memorandum at 10). Thus, the evidence demonstrated the recognition and acquiescence of the fence/hemlocks as the boundary line, for 21 years, **by all parties**. *See id.*

Similarly, in *Plauchak*, a predecessor in title to Gerald W. and Linda Boling (the Bolings), planted a hedgerow between the Bolings' property and property owned by the predecessor of Michael and Ann Plauchak (the Plauchaks). *Plauchak*, 653 A.2d at 673. The Plauchaks' predecessor treated

the land up to the hedgerow as their own, "mowing grass and performing other routine maintenance." *Id.*

> From 1957 through May of 1989, when the [Bolings] purchased their current property, **all predecessors in title to the Bolings** recognized the boundary of their property as corresponding to the hedge row planted by [the Plauchaks' predecessor]….

*Id.* (emphasis added).

Beginning in October 1991, the Bolings planted hedges and pine trees, built fences, and placed no-trespassing signs on the other side of the hedgerow. *Id.* In 1993, the Plauchaks filed an ejectment action claiming the hedgerow constituted a consentable boundary line between the properties. *Id.* The trial court agreed, finding that the hedgerow constituted a consentable boundary line. *Id.* On appeal, this Court affirmed:

> The record is completely clear that Mr. Lunn, one of [the Bolings'] predecessors in title, acted in 1957 to plant a hedge row for the specific purpose of creating a visible demarcation separating what he viewed as his property from that portion of his neighbors' land now claimed by the Plauchaks …. None of the subsequent owners in either the Bolings' or the Plauchaks' chain of title disputed the propriety of this hedge row boundary from 1957 until at least 1989. **During this time, <u>all record owners</u>, including the Bolings' immediate predecessor in interest, recognized the hedge row as the true and correct border between the properties and acted accordingly.**

*Plauchak*, 653 A.2d at 675 (emphasis added). Thus, in *Plauchak*, the evidence established the **mutual** recognition of the hedgerow as the boundary between the properties. *See id.*

Here, there is no evidence that Burton recognized and acquiesced to the stone wall as the property boundary line. Burton did not appear or testify at trial. As the trial court explained,

[t]here was no testimony that the bordering property owner, … [Burton], ever came to his property. [Appellant's] attempt to establish recognition and acquiescence fails in that he fails to prove that the stone wall was ever recognized by anyone other than himself or his father. Although there is a stone wall which [Appellant] is claiming was the boundary line[,] **there is no proof that Burton [] recognized and acquiesced to it as the boundary line.** [Appellant] and [Richard] may have intended the stone wall to be the boundary line, but this does not make it the boundary line. [Appellant's] father may have intended the stone wall to be the boundary line, but the Mengel [S]urvey placed the boundary line elsewhere.

Trial Court Opinion, 5/18/23, at 12 (emphasis added). The trial court's findings are supported by the record, and its legal conclusions are sound. *See id.* Because Appellant failed to establish a consentable boundary line at the stone wall, his first issue merits no relief.

**Evidentiary Issues**

Appellant additionally challenges certain evidentiary rulings by the trial court, and claimed these issues do not represent "separate questions presented." *See* Appellant's Brief at 6 n.1. Nevertheless, we address them separately.

Appellant challenges the trial court's exclusion of certain evidence as hearsay. "[T]he admissibility of evidence is within the sound discretion of the trial court, which appellate courts will not disturb absent an abuse of discretion

or error of law." ***Bayview Loan Servicing LLC v. Wicker***, 206 A.3d 474, 482 (Pa. 2019).

> "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion," but instead requires demonstration that the lower court's decision was "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support from the evidence or the record so as to be clearly erroneous." ***Polett v. Public Communs., Inc.***, 126 A.3d 895, 914 (Pa. 2015) (internal quotation marks and alteration designations omitted).

***Id.*** at 482.

"[T]he Pennsylvania Rules of Evidence define 'hearsay' as an out of court statement offered in court for the truth of the matter asserted." ***Carlini v. Glenn O. Hawbaker, Inc.***, 219 A.3d 629, 640 (Pa. Super. 2019); ***see also*** Pa.R.E. 801(c). "Generally, hearsay is inadmissible at trial unless it falls under an exception provided by the Rules." ***Id.***; ***see also*** Pa.R.E. 802.

Pennsylvania Rule of Evidence 803 provides, in relevant part, the following exceptions:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> ….
>
> **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

....

**(20) Reputation Concerning Boundaries or General History.**
A reputation in a community--arising before the controversy--concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state or nation.

Pa.R.E. 803(3), (20).

*The State of Mind Hearsay Exception*

Appellant first argues the trial court erred in precluding him from introducing testimony about out-of-court statements purportedly made by Burton. Appellant's Brief at 29. At trial, Appellant sought to introduce Burton's emails to him, which stated Burton

> believed the stone fence line was the border since that is true. I also told [Robin Fiester of Robin Realty] I believed it was the border when we walked it.

*Id.* at 31 (citation omitted). Appellant also sought to introduce Burton's statement to Appellant's counsel:

> It was generally believed by my family and I that the stone wall was the dividing line between the 2 properties but that is not based on any survey or special knowledge that I have. At the [beginning] of the sale I did walk the property with Robin Fiester and indicated the wall as the dividing line. That is the extent of my knowledge.

*Id.* (citation omitted). Appellant argues these statements were admissible under Pa.R.E. 803(3) – State of Mind. *Id.* According to Appellant, Burton's

testimony is similar to testimony deemed admissible in **Corbin v. Cowan**, 716 A.2d 614 (Pa. Super. 1998).[6] **Id.** at 32-33.

In **Corbin**, David Corbin (Corbin) disputed the location of the boundary line between his and Frances Cowan's (Cowan) properties. **Id.** at 616. Corbin filed a quiet title action claiming a disputed road was within his property. **Id.** The trial court disagreed and, applying the consentable lines doctrine, concluded that the disputed road was part of Cowan's property. **Id.**

On appeal, this Court addressed Corbin's challenge to the trial court's admission of testimony "from a nearby landowner, that [Corbin's] predecessor in title believed that the disputed area did not belong to him." **Id.** at 618. Deeming such testimony admissible, this Court explained:

> Pennsylvania recognizes a "state of mind" exception to the hearsay rule.
>
> > Often a person's state of mind, knowledge, intent, motive, emotion, competency, or sanity is relevant in a case. That person's contemporaneous statements are an obvious source of information as to the relevant state of mind, and such statements are admissible under the state of mind exception to the hearsay rule.
>
> **Commonwealth v. Hess**, … 548 A.2d 582, 585 (Pa. Super. 1988) (citations omitted). Here, the hearsay statement was not offered to prove the truth of the matter asserted - that those in appellant's chain of title did not, in fact, own the disputed area. Rather, it was offered to show the state of mind of appellant's predecessor in title - that he did not believe he owned the disputed area. Such

---

[6] Appellant does not argue Burton's out-of-court statement is admissible under the "statement against interest" exception also discussed in **Corbin**. **See Corbin**, 716 A.2d at 618.

evidence was material and probative as to the possession of the disputed area during the twenty-one year statutory period….

*Id.* at 618-19.

Here, by contrast, Burton made the proffered statements **after** he had sold Burton's Parcels. They were not made contemporaneous with his ownership. As such, his statements were not material to his possession of the disputed area during the twenty-one-year statutory period. **See id.** at 618-19. The trial court properly precluded this evidence.

Appellant next disputes the trial court's preclusion of testimony regarding Richard's statements about the boundary line. Appellant's Brief at 34. Appellant sought to testify

the reason he and [Richard] decided to clear the field east of the wall; that his "father told him where he wanted the boundary line or where he believed the boundary line to be"; the underlying rationale that led him to carve a tree with his initials and blaze marks in the northwest corner, aligning with the [w]all; and logic behind installing the barbed wire fence extending from the [w]all.

*Id.* (citations and footnote omitted). Appellant argues the recitations were "Richard's communicated thoughts[.]" *Id.* at 34. According to Appellant, Richard's statements commemorated his motive, intent and objective, "and/or complet[ed]" the story regarding Viall Farm "being partially deeded to Appellant and [Burton]." *Id.* at 34-35.

Appellant acknowledges Richard died in the mid-1980s. *Id.* at 35. However, Appellant claims that without this testimony, Richard's state of mind "regarding the transaction with his children is otherwise impossible to

characterize and scrutinize." ***Id.*** Appellant argues Richard's statements "are probative of the speaker's mind because they were directly correlative with the pertinent incidents at the time stated." ***Id.*** at 36.

In its September 22, 2023, opinion, the trial court rejected Appellant's claim:

> Here, Appellant was not offering statements made to him by his deceased father to explain a course of conduct or effect upon him as a listener. The only evidence of any type of course of conduct was [that Appellant] and his father placed a fence in line with the stone wall to keep cattle in during the years of 1972-1974[,] and some timbering that occurred one time in later years. This is insufficient to have a course of conduct. Appellant attempted to offer his deceased father's statements to show that he "believed" the boundary line to be along the stone wall and that his father intended the boundary line to be along the stone wall. In other words, **Appellant attempted to offer statements that his deceased father told him for the truth of the matter asserted as to what his father intended, that is where the boundary line was. This was clearly hearsay.**
>
> Appellant correctly argued that a deceased owner's declaration with respect to boundary [is] competent evidence, in exception to the hearsay rule, when the declarant owner "was on the land at the time the declaration was made, and engaged at the time in pointing out the boundaries of the land." ***Collins v. Clough***, … 71 A. 1077, 1080 (1909). Such evidence is admissible when no more direct evidence is available. ***Id.*** … **However, here, there was direct evidence available — the 1972 Mengel [S]urvey.** The objection to the testimony of what Appellant's father said was properly sustained.

Trial Court Opinion, 9/22/23, at 8 (emphasis added). We agree and adopt the trial court's rationale regarding this claim. ***See id.*** Consequently, Appellant's argument regarding Richard's out-of-court statements merits no relief.

Appellant next argues that Guy Parrish (Parrish), Appellant's nephew, should have been permitted to explain

> the basis for his understanding that the [w]all acted as his uncles' barrier because it was derived from statements [Richard] made to him.

Appellant's Brief at 37. Appellant claims Parrish "would have testified as to [Richard's] motive, intent, and/or plan as to why the [w]all had such significance related to the 1972 property transaction." *Id.*

Appellant does not support his claim with citations to legal authorities, or direct our attention to the place in the record where Parrish's testimony was excluded.

This Court has stated, "[i]t is beyond cavil that, where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *B.S.G. v. D.M.C.*, 255 A.3d 528, 535 (Pa. Super. 2021); *see also* Pa.R.A.P. 2119(a) (mandating that an appellant develop an argument with citation to and analysis of relevant legal authority); *In re S.T.S.*, 76 A.3d 24, 42 (Pa. Super. 2013) ("When an appellant fails to develop his issue in an argument and fails to cite any legal authority, the issue is waived." (citation omitted)). Because Appellant failed to develop his argument regarding the admissibility of Parrish's testimony, we deem it waived. *See* Pa.R.A.P. 2119(a).

Appellant next argues that the trial court improperly precluded his brother, Victor, from testifying about statements within Victor's affidavit. *Id.* at 38. Appellant further claims the trial court improperly disallowed admission of Victor's affidavit into evidence. *Id.* According to Appellant, Victor's affidavit stated the following:

> 6. That my father [(Richard)] designated the stone wall on the northwest side of [Appellant's] property as the property line between the properties of [Appellant] and Burton [].
>
> 7. That from June 12, 1972, until the date Burton sold his property (December 22, 2004)[,] my brothers[,] [Appellant] and Burton[,] understood and held out that the northwest stone wall was the boundary between their respective properties.

Appellant's Brief at 38 (citation omitted). Appellant argues this evidence demonstrated Burton's intent, motive, and plan as to the wall's significance. *Id.* Appellant asserts, the statements should have been admissible under the state-of-mind exception. *Id.*

Appellant claims paragraph 6 of the affidavit intertwined Richard's wishes with the approach taken by both Appellant and Burton. *Id.* at 39. Appellant asserts paragraph 6 proves Burton discussed the subject and formulated a clear plan with numerous individuals. *Id.* According to Appellant, the paragraph further demonstrates Burton's belief about the boundary of Burton's Parcels. *Id.* Appellant claims,

> [i]f Burton made his interpretation about the [w]all known to [Victor] five decades ago, [Burton's] state of mind concerning the factual scenario is past hearsay restrictions….

*Id.* We disagree.

- 35 -

As the trial court explained,

> [t]he statements that Appellant attempted to offer were statements … that his brother believed and/or agreed that the boundary line is along the stone wall; and that his brother and nephew believed the boundary line is along the stone wall. This is not a description of an event or condition. The statements were clearly being offered to prove the truth of the matter asserted.

Trial Court Opinion, 9/22/23, at 10.

Additionally, the trial court stated the following:

[The Superior Court has stated,]

> Rule 803(3) permits only statements establishing the declarant's state of mind, but no one else's. Nevertheless, it also forbids the admission of "a statement of memory or belief to prove the fact remembered or believed" unless it relates to a will. Pa.R.E. 803(3). Thus, the exception provides for very limited uses of state of mind evidence. Proving substantively a fact contained in a statement, *i.e.*, something other than the declarant's state of mind, is not one of those uses.

> ***Commonwealth v. Fitzpatrick***, 255 A.3d 452, 481-82 (Pa. 2021).

> Here, when attempting to present out-of-court statements of his father and brothers and nephew, Appellant did not argue the exception of Rule 803(3) and is thus waived. However, said statements would not be admissible under this exception. The statements that the boundary line was intended to be along the stone wall or that it is believed to be and agreed to be do not fall within this exception. The rule specifically prohibits the admission of "a belief."

Trial Court Opinion, 9/22/23, at 11. We agree and affirm on this basis. ***See***

***id.*** Appellant's challenge to trial court's preclusion of Victor's testimony and

Victor's affidavit merits no relief.

*The Reputation Concerning Boundaries Hearsay Exception*

Appellant next claims testimony about the out-of-court statements of Richard and Burton was admissible under Pa.R.E. 803(20) – Reputation Concerning Boundaries or General History. Appellant's Brief at 40. As stated above, Rule 803(20) provides a hearsay exception for evidence regarding

> [a] reputation **in a community**--arising before the controversy--concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state or nation.

Pa.R.E. 803(20) (emphasis added).

Appellant disagrees with the trial court's interpretation of what constitutes a "community." *Id.* at 41. Appellant argues that the concept of "community", when considering reputation evidence, may include

> a unified body of individuals with common interests living in a particular area and/or a group of people with a common characteristic living together.

*Id.* at 42 (referring to the dictionary definition of community). Appellant posits,

> [Richard's and Burton's] statements to their family members regarding the [w]all should have been admitted into evidence under Pa.R.E. 803(20) as reputational evidence within the applicable "community," especially due to [the trial court] being tasked with ascertain[ing] and effectuat[ing] the intent of the parties at the time of the original subdivision.

*Id.* at 43 (citation and some quotation marks omitted).

In its opinion, the trial court rejected Appellant's argument that a reputation among his family members constitutes a reputation in the community:

> One of the foundation requirements for the admission of reputation evidence is that "the witness learned of the reputation by hearing it discussed in the community." Bernstein, 2021 Pa. Rules of Evidence Comment 3(a) to Pa.R.E, 803(20) (Bernstein). Here, … the witnesses were family members, Victor [] and [] Parrish, Appellant's brother and nephew, but never lived in the community in which the land is situate. Further, when asked where they had heard that the stone wall was the boundary line, they stated Richard [] (Appellant's father). "Reputation" is "not the opinion of one person or even a handful of persons, but must represent the consensus of the community." Bernstein, 2021 Pa. Rules of Evidence Comment 3(a) to Pa.R.E. 803(20) (Bernstein) (citing **Commonwealth v. Blount**, … 647 A.2d 199 (Pa. 1994)). Finally, the out-of-court statements of Appellant's father, brother and other family members do not concern "general historical events important to that community, state or nation" as set forth in Pa.R.E. 803(20).

Trial Court Opinion, 9/22/23, at 13. We agree. We affirm on this basis with regard to Appellant's challenge regarding the testimony's admissibility under Pa.R.E. 803(20).

### Appellant's "Alternative" Claim

As an "alternative" claim, Appellant argues the evidence failed to establish that Defendants own the property to the east of the wall, so as to permit them to build a cabin and install a driveway. Appellant's Brief at 44. Appellant basically reargues his first issue, and claims the totality of the evidence favors a different result. **See id.** at 47-50 (disputing the Gavitt Survey), 50-73 (discussing in detail each survey and disputing the trial court's credibility determinations and the weight it afforded each survey).

We discern no error or abuse of the trial court's discretion. As stated above, the trial court's findings are supported in the record and it properly

concluded Appellant failed to establish a consentable boundary line at the stone wall.  As such, his final claim fails.

Judgment affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/10/2024