J-S23015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| UNIBERSE, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TEAM GLOBAL NETWORK PLUS, LLC | : | No. 495 EDA 2025 |

Appeal from the Order Entered January 17, 2025
In the Court of Common Pleas of Montgomery County
Civil Division at No:  2024-09196

BEFORE:  STABILE, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:                         **FILED NOVEMBER 5, 2025**

Appellant, Uniberse, LLC, seeks review of an order of the Montgomery County Court of Common Pleas (trial court), denying its Petition to Enforce Settlement Agreement with Appellee, Team Global Network Plus, LLC, on the ground that Appellant's own breach of that contract excused Appellee's non-performance.  In its brief, Appellant now contends that the trial court erred in denying its Petition because that ruling was based on an erroneous interpretation of the Agreement's plain and unambiguous terms.  Finding that the trial court adhered to the applicable rules of contract interpretation, we affirm.

The trial court aptly summarized the relevant case facts and procedural history of this case as follows:

> On September 23, 2020, the parties entered into a Membership Interest Purchase Agreement, whereby [Appellee] became 50-50 partner with [Appellant] for $200,000.  Once a partner, [Appellee]

requested access to the software. [Appellant's] sole asset was software for a point-of-sales system[]. [Appellant] refused to provide administrative access without [a] signed . . . non-disclosure agreement.

A lawsuit was initiated and the parties agreed to mediation. At the conclusion of the mediation, the parties executed a Settlement Agreement on July 28, 2023. **Paragraph 3 of the Agreement provides that [Appellant] is to provide the "unlocked source code that will run the software with all functions . . . the software shall include administrative access, coding, mapping and other functionalities required to run the software[.]"** Once [Appellee] receives the Software, [Appellee] is to complete a certification that it has received the full and complete Software. The Agreement further provides that it is void if the Software provided to [Appellee] is anything less than 100% of the as-is Software as of the date of its provision.

In August 2023, [Appellant] transferred the software to [Appellee]. [Appellant] also provided training to [Appellee], as required under the Agreement. However, [Appellee] never completed the certification. [Appellee] also refused to make two $5,000 payments required under the Agreement. [Appellee] was further required to make monthly payments to [Appellant] for the credit card processing fees in August and September. However, only one payment was made in October 2023.

[Appellant] filed this action to enforce the settlement agreement on May 4, 2023, on said Motion. [Appellee] states that the certification was not done because the entire software had not been transferred. **[Appellant] only transferred the source code that existed for the date of the transfer. <u>It did not include the historical data and versions of all the source code and changes made to the Software throughout its development, which is located in Bitbucket</u>**. [Appellee] never received administrative access to the software on Bitbucket. **The Agreement is void due to lack of consideration.**

[Appellee's] expert, David Awad, testified that administrative access, coding, mapping and other functionalities required to run the software . . . "would include historical date on Bitbucket. At the time the Settlement Agreement was executed, [Appellant] had access to the historical data of the Software. In September, [Appellee] made a request for the complete Software. However,

in October 2023, [Appellant] deleted the historical data on Bitbucket due to an error.

David Awad also testified that Bitbucket rarely has technical issues as they host millions of repositories. He also reviewed the error message and stated the error was that of [Appellant] and offered three solutions around the error. In their post-trial briefs, [Appellant] argued [Appellee] was aware of Bitbucket and requested administrative access to the account on October 4, 2022, but never requested access to it during negotiations.

On January 17, 2025, the [trial court] issued Findings of Fact and Conclusions of Law and Order denying Plaintiff's Motion to Enforce Settlement.

Trial Court 1925(a) Opinion, 3/21/2025, at 1-3 (emphasis added).[1]

Appellant timely appealed,[2] raising one main issue — whether the trial court erred "in denying the plaintiff's motion to enforce the Settlement Agreement between the parties by ruling that the Agreement required [Appellant] to provide [Appellee] administrative access to [Appellant's] Bitbucket account, prior versions of it, historical data, and previous versions of the Software code[.]" Appellant's Brief at 2. According to Appellant, the

_____

[1] The subject Software for a "point-of-sales" system, is used by merchants to process the orders of customers and to transmit the orders so that they may be fulfilled. **See** N.T. Trial, 7/23/2024, at 8.

[2] In a separate action, Appellant asserted claims in equity against Appellee, and the record is unclear as to whether any of those equitable claims have been resolved. Regardless, the order on review is final and immediately reviewable for purposes of appeal under Pa.R.A.P. 341 because the denial of Appellant's Petition to Enforce Settlement Agreement resolved all claims between the parties in the present action. **See Am. Mushroom Coop. v. Saul Ewing Arnstein & Lehr, LLP**, Nos. 1780 EDA 2022, 1783 EDA 2022, at 3 n.2 (Pa. Super. filed July 25, 2022) (unpublished memorandum) (quoting **Stevenson v. Gen. Motors Corp.**, 521 A.2d 413, 419 (Pa. 1987)) ("[A] severance of actions effects a splitting of them into one or more independent actions for all purposes, including trial and appellate procedure.").

Agreement included no such terms, and the trial court improperly relied on extrinsic evidence to find that Appellant breached the Agreement.

"[T]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo* and our scope of review is plenary." *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009). "Settlement agreements are regarded as contracts and must be considered pursuant to general rules of contract interpretation." *Thompson v. T.J. Whipple Const. Co.*, 985 A.2d 221, 224 (Pa. Super. 2009) (quoting *Miller v. Ginsberg*, 874 A.2d 93, 99 (Pa. Super. 2005)). "The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties." *Id.*, at 229 (quoting *Miller*, 874 A.2d at 99).

When "the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used." *Id.* (quoting *Miller*, 874 A.2d at 99) (internal citations omitted); *see also Sensenig v. Greenleaf*, 325 A.3d 654, 659 (Pa. Super. 2024) (same); *Monti v. Rockwood Ins. Co.*, 450 A.2d 24, 25 (Pa. Super. 1982) (holding that courts will apply the definitions of contractual terms which are supplied by the contract itself).

Ambiguous or undefined contractual terms, however, may require a court to rely on "extrinsic evidence to ascertain their meaning[.]" *Toth v. Toth*, 324 A.3d 469, 486 (Pa. Super. 2024) (quoting *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 463 (Pa. 2015)). "A contract's terms are considered ambiguous if they are subject to more than one reasonable

interpretation when applied to a particular set of facts." ***Toth***, 324 A.3d at 486 (quoting ***Kane***, 129 A.3d at 463).

A complete failure of consideration – where the performance bargained for is not delivered – renders a contract unenforceable and justifies rescission. ***Umbelina v. Adams***, 34 A.3d 151, 158 (Pa. Super. 2011).

"In a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations." ***Viall v. Garvin***, 318 A.3d 905, 911 (Pa. Super. 2024), ***appeal denied,*** 333 A.3d 1038 (Pa. 2025) (quoting ***L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.***, 777 A.2d 1090, 1092 (Pa. Super. 2001)). A reviewing court will not "pass on credibility of witnesses or to act as the trier of fact." ***Viall***, 318 A.3d at 911 (quoting ***L.B. Foster Co.***, 777 A.2d at 1092).

In the present case, the chief dispute between the parties concerns whether the Settlement Agreement required Appellant to provide Appellee with prior versions of the "Software," or "historical data," dating back to 2022, a time which predated the Settlement Agreement. Appellant argues that it had no such obligation under the Settlement Agreement by its express terms; further, Appellant notes that Appellee had never discussed or requested such data during the parties' negotiations, proving that Appellee never even attempted to bargain for the benefit of the Software's historical data.

Conversely, Appellee asserts that since access to prior versions of the Software was necessary to run the Software properly, both the Settlement

Agreement and industry practice required Appellant to supply the historical data. Appellant's failure to do so, Appellee argues, constituted a material breach of the Settlement Agreement, thereby voiding the Agreement and excusing any non-performance of Appellee's contractual obligations.

We address these respective positions first by focusing on Paragraph 3 of the Settlement Agreement, which reads:

> **Software Provision to [Appellee]**. On the 31st day after this Agreement is executed (or as soon as reasonable after Team Global has located a team) **the entire unlocked source code that will run the Software with all functions shall be provided to [Appellee]**. **The Software shall include administrative access, coding mapping and other functionalities required to run the Software** and shall at a minimum, include the following: (1) the Retail POS and corresponding Deli Order Kiosk, Kitchen Display System (KOS) Inventory Management App (not completed yet, provided as- is), Online Order (web) Ecommerce (magenta and new version). Central Office; (2) the Restaurant POS including Order Kio k Kitchen Display System (KOS) Online Order (web) and Central Office; (3) Android Restaurant POS App (Server not included because it connects to Restaurant POS server)· and (4) Web licensing server. Team Global and Uniberse will have the same Software at the point of time before the Moratorium begins, and **it is understood that if the Software provided is anything less than 100% of the Software as of the date of its provision, this Agreement is void**. Uniberse and [Appellee] shall have unlimited, unfettered use of the Software and may sell, license or disseminate the Software without any restriction following the Moratorium except that the Parties and Hyun Lee agree that they shall not assert any intellectual property rights, patents, copyrights, trademarks, or other ownership interests in or to Software, or any subsequent derivation thereof, that are adverse to the Parties.

Settlement Agreement and Mutual Release, 7/25/2023, at para. 3 (emphases added).

While many of the material terms in the above provision are not specifically defined, the Settlement Agreement *does* unequivocally entitle Appellee to receive all the Software-related access and information "required to run the Software[.]" ***Id***. The parties indisputably intended that Appellee would be able to operate the Software and cure any defects in its source code.

It is not immediately clear from the language of the Settlement Agreement, however, whether it was mutually understood by the parties that Appellee would receive all prior versions of the Software. Accordingly, after hearing evidence, the trial court could find that Appellant breached the Settlement Agreement by failing to disclose the historical data sought by Appellee if there was record evidence showing that the Software could not be properly run or operated without access to such material. ***See Thompson***, 985 A.2d at 224; ***Miller***, 874 A.2d at 99.

At trial, Appellee presented the testimony of David Awad, a software engineer, who was duly qualified to give expert opinions on subjects within his field. Awad testified that, in the software and coding industry, there are two main reasons why all prior versions of a piece of software must be accessible to the party authorized to operate it.

First, Awad explained that, without evaluating prior versions of software, it would be impossible to ascertain if the current version has been produced, or which version is being operated. ***See*** N.T. Trial, 7/23/2024, at 221. In a sale of software, it would be essential for the purchaser to identify both the

current version and all prior versions to confirm that the correct source code has been received. *See id*.

Second, in the event of a defect in the software's source code, an engineer must be able to trace the development of the software to pinpoint the defect's root cause:

> Without having the insight of how that's been misused and used in the past and most importantly, obviously, the changes over the software's lifetime are crucial to understanding what kinds of latent defect might exist in the code that haven't been discovered and which ones may have been concealed.

*Id*.

It was Awad's view that the historical data, or prior versions, of all a software's source code would be so crucial for the software's general use and day-to-day operation that providing those materials to the software's operator would be "a given." *Id*. He testified further that it was "industry standard" to construe Paragraph 3 of the subject Settlement Agreement – which granted Appellee the right to "administrative access, coding, mapping and other functionalities required to run the software" – as necessarily including access to the Software's "historical data." *Id*., at 227-28.

The trial court credited Awad's testimony, as it was free to do, and relied upon the expert opinions of that witness to interpret the critical terms in the Settlement Agreement which were not specifically defined.[3] We discern no

_____

[3] Appellant presented the testimony of Shawn Lee, the father of the owner of Uniberse, Danee Lee. Shawn Lee testified with little to no elaboration that the

*(Footnote Continued Next Page)*

factual or legal error on the part of the trial court in doing so, as its interpretation of the Settlement Agreement fully comports with the applicable law and the evidence of record. Since, in the trial court's valid interpretation, Appellee was contractually entitled to the Software's historical data, and Appellant did not provide it, the trial court did not err in denying Appellant's Petition to Enforce Settlement Agreement or in rescinding the Settlement Agreement.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/5/2025

_____

industry standard is to *exclude* historical data, or prior versions of software, when transferring source code in a sale of software. **See** N.T. Trial, 7/23/2024, at 142. It was, of course, up to the trial court, as the finder of fact, to decide whether to reject this testimony, or to instead credit the conflicting account of Appellee's expert witness, David Awad. **See Viall v. Garvin**, 318 A.3d 905, 911 (Pa. Super. 2024).